IN THE UNITED STATES DISTRICT COURT
FOR NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF VARIOUS ELECTRONIC DEVICES FURTHER DESCRIBED IN ATTACHMENT A, ALL CURRENTLY LOCATED AT THE FBI SAFE STREETS TASK FORCE, LOCATED IN LIMA, OHIO | Case No. 3:22MJ5159-5171 |

**AFFIDAVIT IN SUPPORT OF
APPLICATIONS UNDER RULE 41 FOR
WARRANTS TO SEARCH AND SEIZE**

I, Andrew J. Eilerman, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of applications under Rule 41 of the Federal Rules of Criminal Procedure for search warrants authorizing the examination of property—electronic devices as described in Attachment A—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.      I am a Special Agent of the Federal Bureau of Investigation (FBI) and have been since May 2008. I am currently assigned to the Cleveland Division, Lima Resident Agency. I previously worked in the same capacity in the Cincinnati Division, Dayton Resident Agency and the Minneapolis Division, Grand Forks, North Dakota Resident Agency. I have investigated the commission of federal crimes involving criminal offenses and national security matters to include counterintelligence investigations, violent crimes, and drug trafficking. In the course of these duties, I have participated in numerous federal search and arrest operations and conducted associated interviews which have resulted in the collection of evidence and admissions of multiple criminal violations.

3.     This affidavit is intended to show only that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

## <u>IDENTIFICATION OF THE DEVICES TO BE EXAMINED</u>

4.     The property to be searched is described as follows:

a.   Google Cell Phone in teal/tan colored case, Auglaize County Sheriff's Office (ACSO) evidence item 3 (AMANDA HOVANEC cell phone);

b.   Cell Phone in pink case with lanyard and cracked screen, ACSO evidence item 46 (located in basement of residence on Middle Pike Road);

c.   Cell Phone in dark colored case, ACSO evidence item 48 (located in basement of residence on Middle Pike Road);

d.   Hewlett Packard Laptop, silver color, ACSO evidence item 51 (ANTHONY THEODOROU's laptop);

e.   Dell Laptop, black with silver edge, ACSO evidence item 54 (located in kitchen of residence on Middle Pike Road);

f.   Cell Phone in black case, ACSO evidence item 56 (THEODOROU's cell phone);

g.   Cell Phone in case with pictures of THEODOROU and young children, ACSO evidence item 57 (THEODOROU's cell phone);

h.   Samsung 10-channel DVR, ACSO evidence item 58 (home security system from residence on Middle Pike Road);

i.   Rose Gold colored iPhone in Dimaka "make the best" flower case, ACSO evidence item 59 (believed to be ANITA GREEN's cell phone);

j.   White iPad, ACSO evidence item 61 (located in sunroom of residence on Middle Pike Road);

2

k.  Hewlett Packard Pavilion 23 all-in-one computer, serial number 4UV5390KNJ, ACSO evidence item 67 (located in kitchen of residence on Middle Pike Road);

l.  SanDisk Cruzer 16GB USB drive, red and black in color, ACSO evidence item 70 (located in the room used by THEODOROU); and

m.  Evistr model 157 digital voice recorder, 16GB capacity, ACSO item 78 (located in HOVANEC's Honda Pilot);

hereinafter the "Devices."  The Devices are currently located at the FBI Safe Streets Task Force, located at 204 North Main Street, Lima, Ohio 45801.

5.     The applied-for warrants would authorize the forensic examination of the Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

6.     On April 27, 2022, I was contacted by Wapakoneta Police Officer Cory Zwiebel about belongings left unattended in a room at the Best Western Hotel located at 1008 Lunar Drive, Wapakoneta, Ohio. The guest will be referred to in this affidavit by his initials, T.H., and was unable to be located. According to Officer Zwiebel, T.H. was employed by the United States Department of State as a Security Engineering Officer, and there was concern that some of the electronic equipment located at the hotel room may contain sensitive U.S. government equipment.

7.     On April 27, 2022, I along with Task Force Officers (TFOs) of the Northwest Ohio Safe Streets Task Force responded to the Wapakoneta Police Department. Officer Zwiebel had the contents from T.H.'s hotel room which were collected by the staff at the Best Western Hotel. The FBI assumed custody of the potential U.S. Government property items, which included a cellular telephone, a laptop computer, and a wireless charging device.

3

8.      TFOs traveled to the Best Western Hotel to begin reviewing security footage and I contacted ACSO Detective Timothy Rammel to initiate a joint investigation into the whereabouts of T.H.

9.      During the early stages of the investigation several people were interviewed. One of the first interviews was T.H.'s mother. According to the mother, T.H. and AMANDA HOVANEC (hereafter referred to as AMANDA) were married in July 2012, and they had three children together.

10.      In 2016, T.H. and AMANDA moved to Germany for T.H.'s job and remained there for approximately two years. Following this tour, T.H. was transferred to South Africa. At some point in 2020, AMANDA initiated divorce proceedings against T.H. According to the mother, during their time in South Africa, AMANDA developed a relationship with a South African citizen named ANTHONY THEODOROU (hereafter referred to as THEODOROU).

11.      According to the mother, T.H. recently returned to Wapakoneta, Ohio in order to attend a child custody hearing with AMANDA scheduled for April 22, 2022.

12.      T.H.'s travel records coincide with the information from his mother. Investigators believe that T.H. traveled via his personal vehicle, a 2021 Volkswagen Tiguan, bearing Virginia license plate UBN5147, to Ohio at some point prior to April 19, 2022. Records indicate that T.H. then boarded an aircraft in Dayton, Ohio destined for Washington, D.C. on April 19, 2022. On April 21, 2022, T.H. boarded an aircraft from Washington, D.C. to the Dayton (OH) International Airport. It is believed that T.H. traveled from the Dayton Airport to Wapakoneta via his personal vehicle.

13.      On April 22, 2022, at 3:28 p.m., T.H. made a reservation at the Best Western Hotel in Wapakoneta and arrived there at 8:07 p.m.

4

14.     I interviewed T.H.'s family law attorney, Shannon Hiller. Hiller informed me that T.H.'s soon to be ex-wife, AMANDA, has denied T.H. court-ordered visitation with his children since November 2021.

15.     Prior to the hearing pertaining to custody issues scheduled to occur on April 22, 2022, in the Auglaize County Domestic Relations Court, the judge ruled there was insufficient time to review all of the evidence prior to that scheduled hearing. However, the judge ordered that T.H. be given visitation with their children beginning at 7:00 p.m. on April 22, 2022 until 7:00 p.m. on April 24, 2022. He further ordered that T.H. was to be the residential parent of custody and legal custodian of the three children for the summer beginning on May 28, 2022 until August 5, 2022.

16.     T.H. was seen several times on surveillance camera at the Best Western Hotel on April 24, 2022. At approximately 2:10 p.m., he was observed on camera at the hotel swimming pool with his children. At approximately 3:45 p.m., T.H. and his children departed the swimming pool and went back up to their room. T.H. was last seen on the video surveillance system at 4:27 p.m. where he was seen departing the hotel with his three children.

17.     At approximately 12:00 p.m. on April 25, 2022, Best Western Hotel staff checked T.H's hotel room as he was scheduled to check out on that day. When they opened the door to his room, they observed his personal belongings still there. The staff assumed that T.H. was extending his stay and subsequently charged his credit card for another night. On April 26, 2022, at 1:48 p.m., the staff at the Best Western Hotel again checked T.H's room and noted that nothing had changed since the previous day. They cleaned out the contents of his hotel room and contacted the Wapakoneta Police Department.

5

18.     After being contacted by the staff at the Best Western Hotel, the Wapakoneta Police Department requested an Auglaize County Sheriff's Deputy to attempt to contact AMANDA. According to Deputy Foxhoven, he spoke to AMANDA on April 26, 2022 at her residence on Middle Pike Road, Wapakoneta, Ohio. According to Deputy Foxhoven, AMANDA said that T.H. picked up the three children around 7:00 p.m. on April 22, 2022 at her residence and T.H. dropped the children off at 7:00 p.m. on April 24, 2022. She reiterated this fact in a follow-up interview on April 27, 2022, stating that T.H. was there on April 24, 2022 but only long enough to drop off the children.

19.     Investigators were able to obtain T.H.'s credit card records for the credit card that he had used for his hotel stay. According to the records, it appeared to be the credit card used during his trip to Ohio. The records provided by JP Morgan Chase Visa showed transactions from April 13, 2022, to the last transaction made on April 25, 2022. However, the only two transactions after he was last seen were to his family law attorney which was submitted prior to his disappearance, and the second one being the Best Western Hotel for the one extended night.

20.     Investigators submitted exigent requests to T.H.'s cellular phone carrier, Verizon Wireless, for location information. Per the records, AMANDA called T.H. at approximately 11:01 a.m. on April 24, 2022. The call duration was 312 seconds. There are no further records associated with his cell phone after 10:57 p.m. on April 26, 2022, indicating that either his cell phone ran out of battery or was intentionally turned off.

21.     Investigators conducted a preliminary review of T.H.'s cellular phone's location information. T.H.'s cellular phone connected to a cell tower located at State Route 65, Wapakoneta, Ohio from 7:01 p.m. to 7:56 p.m. on April 24, 2022. This tower is located in the far northeast corner of State Route 65. According to the records, the phone was approximately .1

6

miles from the tower during that time. The cell phone tower located at State Route 65 abuts the west edge of the property located at AMANDA's residence on Middle Pike Road, Wapakoneta, Ohio.

22.     At approximately 7:56 PM, the phone can be observed moving south on State Route 65. The phone continues to move south, through Sidney, then Troy, where it continues through Tipp City on County Road 201 until it arrives in Dayton. The last observed location was near Highland Park, Dayton, Ohio. During their preliminary review, investigators believe the route taken was to avoid Interstate 75.

23.     I contacted Dayton-based FBI SA Robert Buzzard and relayed the information derived from the analyzed cellular data. SA Buzzard, and a TFO from the Southwest Ohio Safe Streets Task Force, responded to the location and located a black Volkswagen Tiguan, with no fixed license plates. The Vehicle Identification Number (VIN) matched the known VIN from the T.H.'s 2021 Volkswagen Tiguan.

24.     The Ohio Bureau of Criminal Investigation and Identification (BCI) Crime Scene Unit was contacted and processed the vehicle for evidence to include latent fingerprints and DNA. Following the search, the vehicle was towed to the Auglaize County Sheriff's Office where it is currently being held.

25.     During the course of the search of the vehicle, the BCI Crime Scene Unit located a dash camera in the front windshield of the vehicle. The item was checked in as an item of evidence and immediately transported back to the Auglaize County Sheriff's Office where a separate BCI Special Agent imaged and reviewed the video contained on the storage medium of the camera.

26.     The storage device appeared to include video beginning on or about March 25, 2022 until April 24, 2022. The video's orientation was forward looking out the front windshield, and therefore did not capture the inside of the vehicle but did capture audio within its vicinity. This dash camera captured T.H. dropping off his children at AMANDA's residence on April 24, 2022, and his ultimate murder.

27.     Upon arriving at AMANDA's residence, AMANDA and ANITA GREEN (hereafter referred to as GREEN) are waiting at the door located next to the garage. GREEN appears to be video recording T.H.'s arrival with her cell phone.

28.     AMANDA walked toward the driver's side of the vehicle and began to interact with the three children. Simultaneously, GREEN waited by the door, located next to the garage of the residence, waiting to take the children into the house. AMANDA can be heard telling the children, "I have a surprise for you inside," and the children enter the residence followed by GREEN still holding her cell phone as if she was recording. This cell phone appears to match the cell phone found inside the residence (item i.) during a search warrant as described in paragraph 49.

29.     Seconds later, T.H. said, "What the heck are you doing? Did you just assault me?" T.H. followed that by saying, "Get away from me. . . Get off of me." T.H. and AMANDA enter the screen of the video from the passenger side of the vehicle. AMANDA is pulling on his hand and shirt as T.H. tries to use his cell phone. AMANDA then aggressively wrestles for his phone eventually knocking it out of his hand onto the ground. AMANDA then pulls on T.H.'s back and neck and gets him to the ground. She held him around the neck (not choking him) until his body went limp. AMANDA immediately picked up his cell phone and took off what appears to be an

Apple watch and turns off the car stopping the video as T.H. laid unconscious and unresponsive on the driveway.

30.     AMANDA was interviewed at the ACSO in the evening hours of April 27, 2022 by ACSO Detective Brian Little and FBI SA Caleb Williams. AMANDA was advised that the interview was voluntary, she was not under arrest, and could leave at any time. AMANDA was asked about T.H., and the events of April 24, 2022. After initially giving untruthful answers, investigators advised AMANDA of her Miranda Rights. AMANDA said she understood her rights and agreed to continue speaking with investigators. Investigators confronted AMANDA with the murder of T.H. to which AMANDA confessed to the killing.

31.     AMANDA admitted she injected T.H. in the shoulder while they were standing next to his vehicle after he dropped off the children. AMANDA was not able to name what she injected T.H. with but referred to it as "poison" or "drug." AMANDA understood that the drug would kill T.H. within minutes. AMANDA said she received the drug in the mail approximately one month before she killed T.H. and that THEODOROU shipped the drug from South Africa to AMANDA at her residence on Middle Pike Road, Wapakoneta, Ohio.

32.     At some point after she injected T.H. with the drug, AMANDA admitted she drove T.H.'s vehicle to Dayton using side and county roads. AMANDA recalled that T.H. had skydiving friends in Dayton and this contributed to her decision to bring his vehicle there. AMANDA left the vehicle near Highland Park in Dayton, Ohio. AMANDA admitted she removed the license plate from T.H.'s vehicle and disposed of it in a nearby trash can or dumpster. AMANDA also disposed of T.H.'s cellular phone and watch, along with the syringe and vial containing the drug.

9

33.     AMANDA stated that THEODOROU followed her to Dayton, driving her Honda Pilot. THEODOROU drove AMANDA back to her residence on Middle Pike Road after they discarded T.H's vehicle. AMANDA believed that they arrived between 11:00 p.m. and midnight. AMANDA left T.H.'s body in the garage of the residence on Middle Pike Road while she and THEODOROU drove to Dayton. AMANDA put a plastic bag over T.H.'s head and body because she was concerned about fluids secreting from T.H.'s body.

34.     Prior to killing T.H., AMANDA told her mother, GREEN, that she was going to kill him. After AMANDA killed T.H., she also informed her mother that it had been done. AMANDA and THEODOROU loaded T.H.'s body into the back of her Honda Pilot. Shortly thereafter, GREEN drove AMANDA and THEODOROU to where they buried the body. AMANDA and THEODOROU buried T.H. in a wooded area located at the northwest corner of Blank Pike and Wrestle Creek Road in Auglaize County, in the Northern District of Ohio. AMANDA and THEODOROU used shovels from GREEN's home to bury the body. AMANDA said that GREEN dropped them off and later returned to pick her and THEODOROU up at a predetermined time. AMANDA picked the burial site because it was near farmland her grandfather used to own.

35.     Your Affiant and ACSO Detective Timothy Rammel interviewed THEODOROU, who was advised of his Miranda Rights and agreed to speak to investigators. After initially being untruthful, THEODOROU admitted to his involvement in the murder of T.M. According to THEODOROU, AMANDA had been talking about killing T.H. for around a year. Due to the custody issues between T.H. and AMANDA, she felt that this was the only way to prevent the children from spending the summer with T.H.

36.     THEODOROU said that he obtained the substance used to kill T.H. He referred to the substance as M99. According to THEODOROU, he had an acquaintance who acquired the substance from a veterinarian in South Africa. THEODOROU was reluctant to provide the name of the person who obtained the drug. When THEODOROU was given the drug from his associate, he mailed it to AMANDA at her address on Middle Pike Road, Wapakoneta, Ohio. When asked what THEODOROU believed M99 to be, he said that it was an animal tranquilizer[1].

37.     A United States Customs and Border Protection (CBP) Officer was able to locate CBP records indicating a DHL package mailed from Pretoria, South Africa on February 22, 2022. According to CBP Officer Michael Daniels, the package was addressed to AMANDA LEIGH HOVANEC, at a residence on Middle Pike, Wapakoneta, Ohio. A telephone number of 419-xxx-2563 was listed as the co-signee contact. The shipper was listed as ANTHONY THEODOROU, 387 Emus Erasmus Avenue in Pretoria, South Africa. According to the DHL tracking, it appears the package was delivered by DHL to AMANDA's residence on Middle Pike Road on March 1, 2022.  On the Custom Clearing Instruction Sheet from DHL, THEODOROU listed his contact number as 060 xxx2812 and email address as aatheodorou008@gmail.com, and the contact number for AMANDA as +1 (419) xxx-2563.

38.     THEODOROU said that he was not involved in the actual killing of T.H. He said that he did not want to see the body and subsequently AMANDA, alone, moved T.H.'s body into the garage. THEODOROU believed that AMANDA brought T.H.'s body into the garage and prepared him to be buried. THEODOROU did not know what AMANDA did to T.H.'s body but when he saw the body later, he noted that there was a plastic bag wrapped over T.H.'s head.

---

[1] M99 is another name for Etorphine hydrochloride, a Schedule II controlled substance.

39.     Shortly thereafter, THEODOROU admitted he and AMANDA departed for Dayton. AMANDA drove T.H.'s Volkswagen and THEODOROU drove AMANDA's Honda Pilot. THEODOROU believed that AMANDA had a "burner" phone during their trip to Dayton, however, he said he did not speak to her on the phone during this trip.

40.     THEODOROU recalled driving to the rough parts of Dayton in an attempt to locate a place to discard T.H.'s vehicle. When they located a place to abandon the vehicle, AMANDA wiped the vehicle down to eliminate potential evidence. THEODOROU believed that they placed T.H.'s belongings into the Honda Pilot and discarded the items at different locations on the return trip home.

41.     When they returned to the residence located on Middle Pike Road, THEODOROU admitted he and AMANDA placed T.H.'s body into the rear of the Honda Pilot. THEODOROU recalled using some sort of bag with handles to move T.H.'s body. AMANDA went into the house and got GREEN, who drove them, and they departed to a pre-determined location where they were going to take T.H.'s body. THEODOROU and AMANDA took three shovels with them during the trip. GREEN drove them to the location and the three of them agreed that GREEN would return and pick them up two hours later. THEODOROU and AMANDA buried the body and GREEN returned to pick them up.

42.     THEODOROU was asked if he was willing to show investigators the location of where they buried T.H.'s body. THEODOROU agreed, and directed investigators to a rural site located in a wooded area just to the northwest of the intersection of Blank Pike Road and Wrestle Creek Road located in Auglaize County. At approximately 10:40 p.m. on April 27, 2022, THEODOROU identified the spot where T.H.'s body was buried. This area was cordoned off and

12

the scene was secured by the ACSO. It was determined that the body would be recovered during daylight hours on the following day, April 28, 2022.

43.     During the interview with THEODOROU, he identified that he had two cellular telephones (items f. and g.) and a laptop computer (item d.) that were currently stored at 19423 Middle Pike Road, Wapakoneta, Ohio.  These items were later recovered in a room with his belongings including clothes, passport, and identification.  Also, in the same room was a USB drive (item l.).

44.     GREEN was initially interviewed at her residence located on Middle Pike Road by FBI SAs. GREEN claimed to have little or no knowledge of the events that transpired on the night in question. Eventually, information gleaned from the other interviews about GREEN's potential involvement was relayed to the interviewing agents and, around this time, her Miranda rights were provided to her.

45.     Following the initial interview, GREEN requested to speak with investigators again. I along with ACSO Deputy and FBI TFO Todd Keller conducted the interview. GREEN was reminded of her Miranda Rights prior to any questioning. GREEN acknowledged that she was aware that AMANDA was planning to do something to T.H., however, she did not believe that anything would actually occur. She acknowledged that her role was to get the children into the house away from the driveway, but also added that this was common practice for her upon the children's return. Just prior to T.H. arriving to return the children, GREEN noticed a towel laying on a table in the room located near the door leading to the driveway. As GREEN approached the item, AMANDA told her to not touch the item as that was the poison.

46.     GREEN initially claimed that she had no knowledge that T.H. was dead. When asked why she didn't contact law enforcement at any point she said that she was concerned that

13

AMANDA would be taken from her. Later in the interview, GREEN added that during the drive to take AMANDA and THEODOROU to bury T.H.'s body she realized that she was now involved. GREEN stated, "I knew at the time we were driving and we stopped . . . I'm in this now."  GREEN admitted after dropping off AMANDA and THEODOROU, she set an alarm to wake up to go back and pick them up.

47.     On April 28, 2022, the Ohio BCI Crime Scene Unit conducted a recovery dig of T.H.'s body. His body was exhumed, and I was able to positively identify T.H. via the FBI's Mobile Biometric Application (MBA). Following the recovery and positive identification, T.H.'s body was transported to the Lucas County Coroner for an autopsy.

48.     The autopsy was conducted on April 29, 2022. I spoke with the medical examiner who, at the time, was just beginning the autopsy. Dr. Jeffrey Hudson indicated that he located an injection site on the upper left shoulder of T.H.'s body. At the conclusion of the autopsy, Dr. Hudson informed ASCO Detective Brian Little that there were no other identifiable reasons that would have caused T.H.'s death. A blood sample was shipped to the FBI laboratory for a final toxicology report.

49.     A search warrant was obtained from Judge Andrew R. Augsburger, Municipal Court of Auglaize County, on April 28, 2022 and authorized a search of the residence located at 19423 Middle Pike Road, Wapakoneta, Ohio.  AMANDA, her three children, and GREEN were the only ones living there.  THEORDOROU was staying there during his time in the United States.  All of the Devices were recovered during the execution of that search warrant on April 28, 2022 or from their person(s) while at the ACSO.

50.     There is probable cause to believe that the Devices will contain evidence of the crimes described herein.  Specifically, THEODOROU admitted that AMANDA had talked of

14

killing T.H. for over a year.  In or before February 2022, AMANDA and THEODOROU had communications regarding obtaining and shipping the M99 from THEODOROU in South Africa to AMANDA in Wapakoneta, Ohio that was used to kill T.H.  Additionally, THEODOROU admitted that AMANDA had a cell phone during their trip to Dayton to dispose of T.H.'s car.  I know through my training and experience, as well as the records from T.H.'s cell phone carrier, data from such devices can show the approximate whereabouts and time of someone's location, including establishing a timeline of events the day of the murder.

51.     Similarly, GREEN can be seen on the dash camera holding her cell phone as if she was recording T.H. and the children minutes before his death, including recording the children going inside.  GREEN's vantage point is different than that of T.H.'s dash camera and will provide further evidence of AMANDA's actions just prior to killing T.H.  Further, GREEN admitted to setting an alarm in order to wake up to pick up AMANDA and THEODOROU as they buried the body and concealed their crime.  Through my training and experience, I know that many people use their cell phone as their alarm clock, and therefore, this Device may contain further evidence of the timeline of events.

52.     The residence also had security camera affixed to the outside of the house and a DVR recorder inside the residence (item h.) that would have captured the killing and/or the actions of AMANDA, THEODOROU, and GREEN on April 24, 2022.  The digital voice recorder was located in AMANDA's Honda Pilot, which was used during the transport of T.H.'s vehicle to Dayton as well as the transport of T.H.'s body to where he was buried.

53.     I believe that the Devices recovered from the Middle Pike residence or from AMANDA during her interview, may contain conversations, communications, internet queries or other information that would assist investigators in furtherance of this matter.  The 10 channel

15

DVR may contain video footage from the time that the crime was committed and, according to other investigators, may contain video footage from at least one camera oriented in the vicinity of the driveway of the residence located at 19423 Middle Pike Road. The digital voice recorder was located in AMANDA's Honda Pilot, which was used during the transport of T.H.'s vehicle to Dayton as well as the transport of T.H.'s body to where he was buried. Based on my training and experience, I know that devices like those sought to be searched herein can communicate with each other and backup or store information from each other for long periods of time.

54.     The Devices are currently in the lawful possession of the Federal Bureau of Investigation after custody was transferred to the FBI from the Auglaize County Sheriff's Office on May 23, 2022. With the exception of ACSO item 3, a Google Cell Phone (item a.), they came into the ACSO's possession when taken during the execution of a search warrant at 19423 Middle Pike Road, Wapakoneta, Ohio, and their location is noted in the beginning of this affidavit and Attachment A. The Google Cell Phone was given to ACSO Detective Brian Little by AMANDA prior to her interview on April 27, 2022. Therefore, while the ACSO might already have all necessary authority to examine the Devices, I seek these additional warrants out of an abundance of caution to be certain that an examination of the Devices will comply with the Fourth Amendment and other applicable laws.

55.     The Devices are currently in storage at the FBI Safe Streets Task Force, located at 204 North Main Street, Lima, Ohio 45801. In my training and experience, I know that the Devices have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were when the Devices first came into the possession of the ACSO.

## **TECHNICAL TERMS**

56.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.   Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.   Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable

17

storage media include various types of flash memory cards or miniature hard

drives.  Most digital cameras also include a screen for viewing the stored images.

This storage media can contain any digital data, including data unrelated to

photographs or videos.

c.  Portable media player:  A portable media player (or "MP3 Player" or iPod) is a

handheld digital storage device designed primarily to store and play audio, video,

or photographic files.  However, a portable media player can also store other

digital data.  Some portable media players can use removable storage media.

Removable storage media include various types of flash memory cards or

miniature hard drives.  This removable storage media can also store any digital

data.  Depending on the model, a portable media player may have the ability to

store very large amounts of electronic data and may offer additional features such

as a calendar, contact list, clock, or games.

d.  Tablet:  A tablet is a mobile computer, typically larger than a phone yet smaller

than a notebook, that is primarily operated by touching the screen.  Tablets

function as wireless communication devices and can be used to access the Internet

through cellular networks, 802.11 "wi-fi" networks, or otherwise.  Tablets

typically contain programs called apps, which, like programs on a personal

computer, perform different functions and save data associated with those

functions.  Apps can, for example, permit accessing the Web, sending and

receiving e-mail, and participating in Internet social networks.

e.  Notebook computer: Notebook computer, also known as a laptop computer,

means a **computer** designed specifically for portability and to be operated for

18

extended periods of time either with or without a direct connection to an AC power source. Notebooks must utilize an integrated computer display and be capable of operation off of an integrated battery or other portable power source. In addition, most notebooks use an external power supply and have an integrated keyboard and pointing device. Notebook computers are typically designed to provide similar functionality to desktops, including operation of software similar in functionality to that used in desktops.

57.     Based on my training, experience, and research, I know that the Devices have the capabilities that allow them to serve as a wireless telephone, digital cameras, portable media players, and notebook computers.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

58.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

59.     There is probable cause to believe that things that were once stored on the Devices may still be stored there, for at least the following reasons:

    a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little

19

or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

60.    *Forensic evidence.*  As further described in Attachment B, these applications seek permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrants, but also forensic evidence that establishes how

20

the Devices were used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b.  Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process.

21

Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrants.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

61. *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrants I am applying for would permit the examination of the Devices consistent with the warrants.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrants.

62. *Manner of execution.*  Because these warrants seek only permission to examine a device already in law enforcement's possession, the execution of these warrants does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrants at any time in the day or night.

## **CONCLUSION**

63.     I submit that this affidavit supports probable cause for search warrants authorizing

the examination of the Devices described in Attachment A to seek the items described in

Attachment B.

Respectfully submitted,

_____
Andrew J. Eilerman
Special Agent
FBI

Sworn to and subscribed telephonically
after being submitted by reliable electronic means
this 24th day of May 2022.

_____
Darrell A. Clay
U.S. Magistrate Judge